NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0850-12T3

PRINCETON SOUTH INVESTORS, LLC,

    Plaintiff-Appellant,

v.

FIRST AMERICAN TITLE INSURANCE
COMPANY,

    Defendant-Respondent.

---

> **APPROVED FOR PUBLICATION**
>
> **September 8, 2014**
>
> **APPELLATE DIVISION**

Argued January 22, 2014 — Decided September 8, 2014

Before Judges Reisner, Ostrer and Carroll.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-3122-11.

Brian P. Flaherty of the Pennsylvania Bar, admitted pro hac vice, argued the cause for appellant (Cozen O'Connor, PC, attorneys; Mr. Flaherty and Diana J. Lin, on the brief).

Robert L. Grundlock, Jr., argued the cause for respondent (Rubin, Ehrlich & Buckley, PC, attorneys; Mr. Grundlock, on the brief).

The opinion of the court was delivered by

REISNER, P.J.A.D.

In this insurance coverage dispute, plaintiff Princeton South Investors (Princeton South or plaintiff) appeals from a trial court order dated September 28, 2012, granting summary judgment in favor of defendant First American Title Insurance Company (First American). The case presents two issues: in the context of a title insurance claim, whether a pending but as-yet-undecided tax appeal by a municipality, asserting that a property has been under-assessed, creates a defect in or an encumbrance on the property owner's title, or renders the title unmarketable; and, based on the policy language, whether the First American policy covered plaintiff's claim. We answer both questions in the negative and, therefore, affirm the order on appeal.

I

To summarize, plaintiff bought foreclosed commercial property at a sheriff's sale.[1] The conditions of sale included a provision that the property was being sold "subject to . . . unpaid taxes or assessments." There were no delinquent taxes outstanding at the time of the sale or on the effective date of

---

[1] Princeton South's parent company, Rubenstein Properties Fund LP, was the successful bidder at the sheriff's sale and negotiated the title policy. Rubenstein created Princeton South as an entity to take title to the property. We will refer to Princeton South and Rubenstein, collectively, as plaintiff.

A-0850-12T3

the First American title policy. However, plaintiff contends that municipal tax appeals covering several prior tax years, which were pending at the time it bought the property, constituted a title defect covered by the policy.[2] Plaintiff cites no cases from this State or from any other jurisdictions that so hold.

On the other hand, defendant cites case law from other jurisdictions that is both on point and persuasive. Defendant further relies on language in the title policy, both in terms of what is covered and what is excluded, that, read together, convinces us that the policy does not insure against the imposition of taxes assessed after the date the policy was issued.

---

[2] There is no dispute that before plaintiff closed on the property, its representatives knew that the tax assessment of the property was based on an unrealistically low value. Before closing on the property, plaintiff did not bring that information to First American's attention, ask the current owner or the municipal tax office about possible pending tax appeals, or order a tax search from the municipal tax office. See N.J.S.A. 54:5-12. While negotiating the terms of the title policy, but without disclosing its concerns about the low assessment, plaintiff asked First American to delete a policy exclusion for omitted or added assessments. First American refused to do so. Plaintiff claims it had no actual knowledge that there were pending tax appeals, until after the closing occurred. On the record before us, there is a material dispute of fact as to that issue. If plaintiff knew about the pending tax appeals before the closing, its claim would probably be barred by a policy exclusion for known risks the insured voluntarily undertook without disclosing those risks to First American.

We review an order granting summary judgment de novo, using the same legal standard employed by the trial court. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). Likewise, we owe no deference to the trial court's legal interpretations, including its construction of an insurance policy or other contract. Ibid.

A title insurance policy is a "'contract that protects a landowner against loss caused by defective title to the land.'" N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co., 203 N.J. 208, 217 (2010) (quoting Shotmeyer v. N.J. Realty Title Ins. Co., 195 N.J. 72, 82 (2008)). Title insurance protects a buyer against the risk of defects that exist at the time the policy is purchased, but not against the risk of defects that may arise in the future. Shotmeyer, supra, 195 N.J. at 82. "In that sense, title insurance covers 'a state of ownership at a specific point in time.'" Ibid. (quoting 11 Couch on Insurance § 159:5 (3d ed. 1998)).

Like other types of insurance, a title insurance policy should be "'liberally construed in favor of the insured and strictly construed against the insurer.'" Ibid. (quoting Sandler v. N.J. Realty Title Ins. Co., 36 N.J. 471, 478-79 (1962)). However, courts will enforce the title insurance

policy as written and will not rewrite a more favorable policy for the insured than the one purchased. See ibid.; Amidano v. Donnelly, 260 N.J. Super. 148, 154 (App. Div. 1992), certif. denied, 133 N.J. 435 (1993).

A.

Before focusing on the title policy at issue in this case, it is helpful to consider the way annual property taxes are assessed in New Jersey. First, the municipal tax assessor must assess all property as of October 1 of the pretax year. N.J.S.A. 54:4-23. After completing the preparation of the municipal tax assessment list, the assessor files the list with the County Board of Taxation (Board), which may examine, revise and correct the proposed assessments. N.J.S.A. 54:4-35. The annual taxes on a particular property are set by multiplying the municipal tax rate — previously set by the Board — by the property's assessed value. See East Orange v. Palmer, 47 N.J. 307, 317 (1966). The annual tax then "becomes due in four installments on February 1, May 1, August 1 and November 1." Id. at 318.

Once taxes are assessed, they give rise to a lien on the property which continues unless they are paid. See N.J.S.A. 54:5-6 ("Taxes on lands shall be a continuous lien on the land on which they are assessed . . . ." (emphasis added)). "A lien

arises against the real estate on which the taxes are assessed in the event of non-payment." S & R Assocs. v. Lynn Realty Corp., 338 N.J. Super. 350, 360 (App. Div. 2001). In Princeton Office Park v. Plymouth Park Tax Services, LLC, ___ N.J. ___, ___ (2014), the Court recently observed that N.J.S.A. 54:5-6 "confers on a municipality . . . 'a continuous lien on the land'" for delinquent taxes, and provides that any subsequent delinquent taxes are added to the lien. Id. at ___ (slip op. at 11) (quoting Simon v. Cronecker, 189 N.J. 304, 318 (2007)). Here, there were no delinquent taxes at the time First American issued the policy, and any potential taxes that might have arisen in the future, following a successful tax appeal, had not yet been "assessed." N.J.S.A. 54:5-6.

If a taxpayer wishes to challenge the assessed valuation of the taxpayer's property, or if a taxing district "feel[s] discriminated against by the assessed valuation of property in the taxing district," the taxpayer or taxing district may file an appeal with the Board. N.J.S.A. 54:3-21(a)(1). If the assessed valuation of the property is in excess of $1,000,000, the complaint can be filed directly in the Tax Court, provided it is filed "on or before April 1, or 45 days from the date the bulk mailing of notification of assessment is completed in the taxing district . . . ." N.J.S.A. 54:3-21(a)(1). Here, the

municipality filed its appeals for this property for tax years 2009, 2010, and 2011, directly with the Tax Court. See N.J.S.A. 54:51A-2. If the municipality prevails on its appeal, the Tax Court will "enter judgment revising the taxable value of the property." N.J.S.A. 54:51A-6(a). Based on that revised taxable value, additional taxes may be assessed which, if not paid, will give rise to a lien. See S & R Assocs., supra, 338 N.J. Super. at 360.

In addition to the regular annual tax assessments, the tax statutes make provisions for omitted or added assessments. The term "omitted assessment" refers to a situation where properties have been inadvertently, or intentionally but incorrectly, omitted from an annual assessment.

> In any year or in the next succeeding year, the county board of taxation may, in accordance with the provisions of this act, assess any taxable property omitted from the assessment for the particular year.
>
> [N.J.S.A. 54:4-63.12.]

An "added assessment" taxes improvements to real estate that are substantially ready for their intended use after the assessor has completed the annual October 1 assessment.

> [W]hen any parcel of real property contains any building or other structure which has been erected, added to or improved after October 1 in any year and completed before January 1 following, the assessor shall, after examination and inquiry, determine the

taxable value of such parcel of real property as of the first day of the month following completion . . . and . . . if such value so determined exceeds the assessment made as of October 1 preceding, the assessor, shall enter the amount of . . . such excess, as an assessment or an added assessment against such parcel of real property, for the subsequent tax year in a list to be known as the "Added Assessment List, 19 . . . " (inserting the name of the year in which the assessment is made); . . . . In addition, the assessor shall enter in such added assessment list an assessment for that portion of the pretax year between the first day of the month following completion . . . and December 31 to be determined by multiplying the amount of such assessment or such excess by the number of whole months remaining in the pretax year after the completion . . . of said property, and by dividing the result by 12.

[N.J.S.A. 54:4-63.2.]

The tax statutes give prospective purchasers of real property a means of protecting themselves against unanticipated assessments or outstanding taxes at the time of purchase. By statute, ordering a municipal tax lien search protects a prospective buyer against assessments not disclosed in the search. Within fifteen days after receiving a search request and the required fee, the tax official must

issue a certificate certifying the taxes, assessments or other municipal liens or charges, levied or assessed against the property described in the application, which are liens thereon at the date of the certificate. He shall include therein all unpaid installments of assessments

> theretofore levied and in force, whether due or not . . . .

[N.J.S.A. 54:5-12.]

The purchaser is thereafter protected against municipal liens not disclosed on the certificate:

> A bona fide purchaser, lessee or mortgagee who shall acquire for a valuable consideration an interest in lands covered by an official tax search and in reliance on said search shall hold such interest free from any municipal lien . . . not shown on that search.

[N.J.S.A. 54:5-17.]

At least one case also holds that a municipality's failure to disclose its pending appeal of a tax assessment, in response to a prospective purchaser's tax search request, will preclude the municipality from collecting additional taxes based on the appeal. Go-Lit Realty Co. of N.J. v. City of Jersey City, 120 N.J.L. 592, 594 (Sup. Ct. 1938). Thus, the Legislature has required municipalities to "turn square corners" by disclosing in a tax search financial information that would be important to a prospective purchaser in deciding whether to buy the property. Ibid.; see Belles v. East Amwell Twp., 178 N.J. Super. 63, 73-74, 2 N.J. Tax 103, 112-13 (Tax 1981) (municipality must disclose in a tax search report the "virtual certainty [] of an omitted assessment"); F.M.C. Stores Co. v. Borough of Morris

<u>Plains</u>, 100 <u>N.J.</u> 418, 427 (1985) (discussing square corners doctrine).[3]

B.

Against that background, we consider the First American title policy. The policy protects plaintiff from "Covered Risks" subject to certain exclusions. The pertinent policy language provides coverage for "[a]ny defect in or lien or encumbrance on the Title.[4] This Covered Risk includes but is not limited to insurance against loss from" a list of stated risks.

---

[3] In this case, rather than ordering a municipal tax search, plaintiff's counsel simply called the municipal tax office to inquire about any outstanding taxes. In so noting, we are not implying that counsel was negligent. Due to the upcoming sheriff's sale, at which plaintiff needed to place a bid or lose the chance to buy the property, time was of the essence. Plaintiff might have decided to take a calculated business risk by having its counsel perform a telephone inquiry rather than waiting for the results of a municipal tax search.

[4] First American's Underwriting Library, a copy of which is included in appellant's appendix, contains a list of definitions applicable to its policies. The Library defines "defect" as: "A blemish, imperfection or deficiency. A defective title is one that is irregular and faulty." The term "encumbrance" is defined as: "<u>A claim</u>, right, or lien <u>upon the title</u> to real estate, held by someone other than the real estate owner." (Emphasis added). In turn, "claim" is defined as: "A right to assert, or the assertion of, a demand for payment of money due, or the surrender or delivery of possession of property or the recognition of some right. A demand for something as one's rightful due." A "lien" is defined as: "The liability of real estate as security for payment of a debt. Such liability may be created by contract, such as a mortgage, or by operation of law, such as a mechanics lien."

Those stated risks include unpaid taxes that were due and payable, but unpaid, at the time the policy took effect:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, FIRST AMERICAN TITLE INSURANCE COMPANY . . . insures, <u>as of Date of Policy</u> . . . against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:
>
> . . . .
>
> 2. Any defect in or lien or encumbrance on the Title. This covered Risk includes but is not limited to insurance against loss from
>
> . . . .
>
> (b) <u>The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.</u>
>
> . . . .
>
> 3. Unmarketable Title.

[Emphasis added.]

The next section of the policy is entitled "Exclusions from Coverage" and specifically excepts from coverage: "Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed." Paragraph 3(d) of the Exclusions section also excepts from coverage: "Defects,

A-0850-12T3

liens, encumbrances, adverse claims, or other matters . . . (d) attaching or created subsequent to Date of Policy."

An additional section entitled "Schedule B" details Exceptions from Coverage, including:

> [T]he Company will not pay loss or damage, costs, attorney's fees or expenses that arise by reason of:
>
> . . . .
>
> 2. Lien of unpaid taxes for the year 2011. Taxes are paid through the 2nd quarter of 2011. 2011 3rd quarter taxes, a lien, due but not delinquent.
>
> . . . .
>
> 3. Subject to added or omitted assessments pursuant to <u>N.J.S.A.</u> 54:4-63.1 et seq. <u>not yet due and payable</u>.
>
> [Emphasis added.]

It is clearly inferable from Exclusion 3(d), particularly read together with the other policy provisions that specifically address taxes, that the policy does not cover tax liens created after the policy was written.

### III

We turn next to plaintiff's central argument on this appeal. Plaintiff claims that the municipality's pending tax appeals, in themselves, create a defect in or encumbrance on its

title, or render the title unmarketable.[5]   Plaintiff contends that the appeals cloud the title, because they have the capacity to eventually result in a higher assessment of the property, which in turn would result in the imposition of additional taxes which, if unpaid, will become a lien on the property.

Plaintiff's argument, however, proves too much.   The underlying issue in the tax appeals is the alleged under-valuation of plaintiff's property by the tax assessor. Accepting plaintiff's argument would mean that any time a property was assigned too low a value by the tax assessor, the property's title would be considered defective or unmarketable due to the risk of a tax appeal and a reassessment.   But to intelligently insure against such a risk, a title insurer would have to research the assessed value of every property to be insured, and analyze its potential for a tax appeal and a higher revaluation.   Plaintiff did not present an expert report to the trial court — and cites no legal authority on this appeal — to support the proposition that a title insurer has a duty to make such an analysis.   Further, we consider it likely that imposing such a new obligation could drive up the cost of title insurance.   See Shotmeyer, supra, 195 N.J. at 83 (stating that

_____

[5] For purposes of this opinion, we refer to the existence of any of these title problems as a "cloud" on the title.

"because insurance premiums and coverage provisions are based on predictable levels of risk, title insurers need to rely on certain consistent conditions in order to calculate premium rates reliably").[6]

Pursuing plaintiff's argument further only reveals its additional weakness. Taxes do not actually become a lien on property until they are assessed. See N.J.S.A. 54:5-6. Until then, they are only a potential expense which the owner may have to pay in the future. Future assessments, however, cannot logically be considered a cloud on title, because taxes are a known, predictable, constantly-recurring phenomenon. Taxes will be assessed on plaintiff's property this year, next year, and on into the future ad infinitum. If a property's potential for the future assessment of taxes were considered a cloud on title, it would be impossible to pass marketable title to any property.

As the court explained in Keown v. West Jersey Title & Guarantee Co., 161 N.J. Super. 19, 23 (App. Div.), certif. denied, 78 N.J. 405 (1978):

> A marketable title is one that is relatively free from doubt, such that in a suit for

---

[6] Moreover, if the property's condition of being under-assessed were a title defect, this was a risk plaintiff knew about before it bid on the property, and which it failed to disclose to First American. Hence, it would probably fall under the policy exception for known risks which the prospective insured failed to disclose to the insurer.

> specific performance a court would compel the prospective purchaser to accept the title. 4 American Law of Property § 18.7 at 670 (1952). If it is reasonably probable that the purchaser would be exposed to litigation not of a frivolous nature concerning the title, or would have to bring an action to quiet title, then specific performance would be denied to the prospective seller and the title would be considered unmarketable.

A municipality's tax appeal is not "litigation . . . concerning the title" to property, such as, for example, a suit to foreclose an existing lien, challenge a boundary, or enforce "restrictive covenants on the use of the property." Id. at 23-24. Rather, a tax appeal is litigation challenging the property's valuation for tax purposes. See N.J.S.A. 54:3-21(a)(1).

In support of its appeal, plaintiff cites the Law Division's opinion in Bel-Air Motel Corp. v. Title Insurance Corp., 183 N.J. Super. 551 (Law Div. 1981). That case concerned an omitted assessment for a local sewer improvement, a condition that would be specifically excluded by the First American policy. By statute, the local improvement assessment became a lien "upon confirmation by the governing body, or by the court." N.J.S.A. 40:56-33.[7] In other words, as soon as the governing

---

[7] The statute was amended in 2002. L. 2002, c. 15, § 2. We quote the version in effect in 1981.

body confirmed the assessment for the sewer improvement, it became a lien "upon the real estate described in the assessment." N.J.S.A. 40:56-33. The assessment in Bel-Air was confirmed in 1967, three years before the plaintiff bought the property in 1970, but the assessment was invalidated in 1968, and a reassessment was not completed until 1976. Bel-Air, supra, 183 N.J. Super. at 552.

The court observed that N.J.S.A. 54:5-18.1 required municipalities to provide "official certificates of searches as to municipal improvements authorized by ordinance of the municipality but not assessed." Id. at 554.[8] The court also observed that, by statute, one who acquires land in reliance on such a certificate showing no assessment, takes the land free from any subsequent municipal lien for improvements. Id. at 554 (citing N.J.S.A. 54:5-18.5). Based on those statutory provisions, the court reasoned that the Legislature had recognized that an enacted assessment ordinance created a defect

---

[8] This section applies to assessments that are certain to be imposed, even if not presently quantified in amount: "[T]he governing body of each municipality shall provide by resolution for the making of official certificates of searches as to municipal improvements authorized by ordinance of the municipality, but not assessed, affecting any parcel or tract of land in said municipality in that a future assessment will be made thereon pursuant to such ordinance." N.J.S.A. 54:5-18.1 (emphasis added).

in title as to the properties subject to the assessment, even if the amount of the assessment was not yet approved.

In reaching that conclusion the judge reasoned that "[a] 'defect' in a title is something different from a 'lien or encumbrance,'" and could be considered as "'the want or absence of something necessary for completeness or perfection.'" Id. at 555 (quoting McMinn v. Damurjian, 105 N.J. Super. 132, 139 (Ch. Div. 1969)). See also Stewart Title Guar. Co. v. Greenlands Realty L.L.C., 58 F. Supp. 2d 370, 382 (D.N.J. 1999) (noting that a defect "is something less than 'unmarketability.'"). He concluded that a defect existed due to the certainty of the assessment:

> I conclude a title defect affecting plaintiff's property existed in 1970 when it was purchased; it was created in 1967 when the improvement was completed and therefore prior to the purchase and the issuance of the defendant's policy. The ordinance was effective whether or not the commissioners' report had been filed. The fact that the local improvement had been completed made the eventual assessment of the property a certainty. The only question then remaining was the amount of the assessment. Bel-Air, therefore, bought its property subject to a liability: the obligation to pay the assessment when its amount was fixed, an obligation which would ripen into a lien when the assessment was confirmed. The Legislature recognized the fact that the local improvement ordinance itself created a title defect when it adopted N.J.S.A. 54:5-18.1, mandating searches for municipal improvements not assessed in order to

> protect prospective purchasers of property. The ordinance contains a description of the areas in the municipality in which the improvement was to be constructed. If examined, it would have revealed the liability to which plaintiff's property was subject. The fact that this property was not included in the list of assessments which accompanied the initial report of the assessment commissioners is of no moment. The ordinance provided appropriate notice that it was subject to assessment. Furthermore, <u>N.J.S.A.</u> 40:56-33 makes the omission immaterial; it states that the assessment is a lien "notwithstanding any mistake in the name or names of any owner."
>
> [<u>Bel-Air</u>, <u>supra</u>, 183 <u>N.J. Super.</u> at 555-56 (emphasis added).]

The court also reasoned that the title was unmarketable because the "property was subject to a <u>definite liability</u>. It <u>would</u> be assessed for part of the cost of the local improvement," and "[t]he assessment, when confirmed, would become a lien against the property." <u>Id.</u> at 557 (first emphasis added, second emphasis in the original).

<u>Bel-Air</u> is not binding on this court and we need not decide whether it was correctly decided. It is distinguishable, because it addressed a local assessment that was a certainty, based on the passage of a municipal ordinance and the installation of a physical improvement affecting the property. See <u>Strass v. District-Realty Title Ins. Corp.</u>, 358 <u>A.</u>2d 251, 258 (Md. Ct. Spec. App. 1976) (holding that "the assessments in

this case were not encumbrances until they were inevitable").
By contrast, the case before us concerns additional taxes that
have not been assessed and may never be assessed.  We also find
the case inapplicable here, for the same reasons we find that
un-assessed property taxes generally are not a cloud on title.
All future taxes are a potential lien on property; the fact that
their imposition is "inevitable" does not make them clouds on
title for purposes of title insurance.

We also reject plaintiff's invitation to construe an
exception to the First American policy for added or omitted
taxes as an implied extension of coverage for other types of
future assessments.  See Weedo v. Stone-E-Brick, Inc., 81 N.J.
233, 247 (1979).  Instead of inferring coverage from the
language of this exception, we look first to the affirmative
statement of coverage for taxes.  That language is limited to
the "lien" of taxes which have already been assessed and are
"due and payable but unpaid."  The potential additional taxes,
which might be assessed if the municipality wins its tax
appeals, do not fit any of the quoted criteria.

While it may be argued that the paragraph covering taxes
due and owing but unpaid, is part of a non-exclusive list of
covered title defects, policy exclusion 3(d) specifically
excludes from coverage liens and other title defects "attaching

or created" after the date of the policy. The fact that a policy exception also specifically excepts from coverage added or omitted assessments serves, at most, to emphasize that future taxes are not covered.[9]

Our conclusion, that the First American policy does not cover the pending municipal tax appeals, is supported by out-of-State authority holding that "the mere prospect of future taxes" is insufficient to create an encumbrance or other covered title defect under a policy of title insurance. Rhone v. First Am. Title Ins. Co., 928 N.E.2d 1185, 1195 (Ill. App. Ct. 2010). "[I]n the context of a title insurance policy, we reject the Rhones' reliance on a broad use of the term 'encumbrance' to bring their claim regarding unassessed and unlevied [property] taxes within the title policy." Id. at 1194.[10]

---

[9] The record does not reflect when this provision became part of the standard policy. It may have been added in response to the Bel-Air decision. Or it may have been a response to Belles, supra, a Tax Court decision stating that, to be consistent with the purpose of the legislation authorizing omitted assessments, they are considered liens as of the tax year in which they should have been assessed. Belles, supra, 178 N.J. Super. at 68-69, 2 N.J. Tax at 107-08.

[10] In Rhone, the court recognized that "[e]ncumbrances 'include not merely liens such as mortgages, judgment liens, [or] taxes *** but also attachments, leases, inchoate dower rights, water rights, easements, restrictions on use, or any right in a third party which diminishes the value or limits the use of the land granted.'" Id. at 1190 (citations omitted).

The Utah Supreme Court cogently addressed the issue in the following language, which we find persuasive:

> Unlike other insurance contracts, title insurance does not insure against future events. Thus, in order for a defect, lien, or encumbrance to fall within the insurance policy's coverage, it must have been in existence as of the effective date of the policy. At a minimum, an existing assessment that has been recorded would be considered a defect in the title and would be covered unless it had been otherwise exempted or excluded. The more difficult question, and the one before us now, is whether the recorded notice of the possibility of a future assessment also rises to the level of a defect, lien, or encumbrance. We conclude that it does not.
>
> [Vestin Mortg., Inc. v. First Am. Title Ins. Co., 139 P.3d 1055, 1057 (Utah 2006) (footnote omitted) (citing 43 Am. Jur. 2d Insurance § 529 (2003)).]

See also Edwards v. St. Paul Title Ins. Co., 563 P.2d 979, 980-81 (Colo. App. 1977) (holding that "the prospect of taxes in the future was not a lien, encumbrance, or defect as of the date of issuance of the policy" and did not affect the marketability of the title); Butcher v. Burton Abstract Title Co., 216 N.W.2d 434, 436-37 (Mich. Ct. App.), cert. denied, 419 U.S. 998, 95 S. Ct. 314, 42 L. Ed. 2d 293 (1974).

In conclusion, summary judgment was properly granted, because (a) the pending tax appeals did not render the title unmarketable or constitute a defect in or encumbrance on the

A-0850-12T3

title, and (b) the First American policy, by its terms, did not cover the potential future lien of taxes that might be assessed after the policy was issued.[11]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[11] To the extent not specifically addressed here, plaintiff's arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-0850-12T3