2016 OK CIV APP 60

William W. CHOATE, Individually, Plaintiff/appellant,

v.

LAWYERS TITLE INSURANCE CORPORATION, Now Fidelity Title Insurance, Defendant/appellee.

Case Number: 113372

Court of Civil Appeals of Oklahoma, Division No. 3.

Decided: 12/11/2015

Mandate Issued: 10/05/2016

Rehearing Denied January 21, 2016

William W. Choate, CHOATE & CHOATE, P.C., Seminole, Oklahoma, · for Plaintiff/Appellant, Melvin R. McVay, Jr., Clayton D. Ketter, Catherine L. Campbell, PHILLIPS MURRAH, P.C., Oklahoma City, Oklahoma, for Defendant/Appellee.

Wm. C. Hetherington, Jr., Chief Judge:

¶ 1 This action for breach of contract, implied duty of good faith and fair dealing (bad faith), negligence, and negligent reten-tion was filed by Plaintiff William W. Choate (Insured) against Defendant Lawyers Title Insurance Corporation, now Fidelity Title Insurance .(Title Insurer), seeking recovery under the title insurance policy issued to In-sured for fire damage ;to a building on the insured property. The trial court's judgment dismissing Insured's claims and finding the defects in· his petition are incurable is AF-FIRMED.

## HISTORY OF THE CASE

¶ 2 According to the petition, Insured pur-chased on Sept. 28, 2005, six lots within the city limits of Seminole, Oklahoma (the Prop-erty) with a 28,000 square foot steel framed masonry ·building (the Building) previously owned and occupied by the First United Methodist Church of Seminole (the Church). On the same date, Insured purchased from Title Insurer's· predecessor an Owner's Poli-cy of Title Insurance (the Title· Policy) through its agent, Cadenhead Title Insurance (Cadenhead Title), owned and operated by its principal, Ivie Edward Cadenhead, III (At-torney).

¶ 3 Two years later, on January 7, 2007, the Building was severely damaged in a fire determined by the State Fire Marshal inves-tigator to be caused by arson. On a later unknown date, Insured's "complaints" were denied by Title Insurer's predecessor. On February 4, 2013, Insured filed his petition against Title Insurer.

¶ 4 Under the petition's "Facts Common to All Counts," Insured alleges the following: In 1999 the Church sought to relocate to a new building on other property for which it "solic-ited [Attorney] to procure a bid for the raz-ing of [the Building]," who then "served on the Board of Trustees for [the Church]." The Church's "intent to raze their church building was memorialized in the City of Seminole files by Church memorandum, evidencing the irrevocable commitment to demolish the 'old' building." The Church later decided to ·sell the Property with· the Building, listed it with a local real: estate agent, and in 2001, con-veyed it all by general warranty deed to Insured's predecessors in title, from whom

he later purchased the property in September 2005.

¶ 5 After purchase and/or closing on the property, Insured alleges "later investigation revealed the City of Seminole policy decision evidenced "by letter from a former City employee who had knowledge that the City Manager and members of the Code Enforcement Division determined before [Insured's] purchase that [he] would never receive a[n] 'occupancy certificate'" for [the Building]." He further alleges the employee's letter detailed 1) "a meeting in which the same employees discussed delaying the fire department's response to any fire at [the Building]" and 2) a "policy decision" of the City of Seminole (City) "to remove several downtown buildings, including [Insured's] building, that [City] deemed *"dilapidated and blighted structures"* in need of condemnation.

¶ 6 The day after the Building burned, Insured alleges City, "without notice to [Insured] or his consent and before he could assess the fire damage or the state fire marshal could conduct their investigation," procured a contractor to demolish the entire building for alleged "safety reasons," leaving nothing but a pile of rubble. City paid to remove the rubble which "left a vacant lot where the Building used to stand." According to Insured, such removal "effected [City's] policy that [Attorney] failed to disclose in his Owner's Policy of Title Insurance issued to [him] through Cadenhead Title."

¶ 7 Insured alleges Attorney served on the Church's Board of Trustees and "as City Attorney for [City] at the times relevant when [Insured] purchased the [Property]," and "therefore had knowledge of the plans and the commitment of the City to raze the church building *before* [Insured] had purchased the Building" and "knew or should have known of [City's] policy to remove" the Building. He further alleges that "after the fire loss" his investigation discovered Attorney's "undisclosed conflict" and his failure to disclose his knowledge of City's policy "that *resulted* in the eventual loss of the Building."

¶ 8 Incorporating by reference all prior allegations in each of the petition's four "counts," Insured specifically alleges as a breach of contract that *the Policy* and *Ca-*

*denhead Title* "failed to disclose" Attorney's role as City Attorney, Church Board member, and his knowledge of City's policy to remove several downtown buildings. Insured alleges City's policy decision *"created"* a defect in or lien or encumbrance on the title that directly and adversely affected (sic) the unmarketability of the title to the financial detriment of [Insured]." Under the same theory, Insured further alleges the express terms of the Title Policy make Title Insurer responsible for the "errors and omissions of or torts committed by its agents" and that Title Insurer breached its "limited liability exclusion" to Insured's "financial detriment ... by failing to monitor its agents such as Cadenhead Title and thereafter allow [Insured's] title to be adversely affected (sic) by the (2) defect in or lien or encumbrance on the title and the (3) unmarketability of the title." Insured lastly alleges "as direct and proximate result of [Title Insurer's] breach of contract, he "suffered financial losses due to the loss of the building and the loss of other monies paid by Insured to repair the building before the building was razed by the City of Seminole."

¶ 9 Under "Count II: Negligence," Insured alleges Title Insurer had a duty: 1) to use ordinary care and skill when placing its agent, Cadenhead Title, in such a position with Insured that the agent would cause him harm; and 2) a duty to monitor and investigate their agents and also to require the agent to disclose any potential conflicts of interest that might adversely affect the marketability of the title insured by Title Insurer. Insured alleges because his property was located in the city limits of Seminole, Attorney's role as City Attorney "placed in him direct conflict with [Insured] because [his] property would be subject to the jurisdiction of [City's] municipal codes and ordinances that [Attorney] would be responsible for enforcing." Because Cadenhead Title failed to disclose Attorney's knowledge of City's policy decision to remove several downtown buildings, Insured alleges Title Insurer breached its duty to Insured to his financial detriment by negligently failing to monitor its agents and thereafter allow Insured's title to be adversely affected by a "defect in or lien or

encumbrance on the title" and "unmarketability of the title."

¶ 10 Under the "Negligent Retention" count, Insured alleges Title Insurer knew or should have known Attorney had a conflict of interest "because his role as City Attorney would place him adverse to the title policy holders that had real property within the city limits of Seminole." He also alleges Title Insurer breached its duty to use reasonable care "in training its employees and agents by its failure to conduct a reasonable investigation into Cadenhead Title's conflict of interest" and "remov[ing] Cadenhead Title once [Title Insurer] knew or should have known of the unreasonable risk of conflict of interest to Insured." As direct and proximate result of Title Insurer's negligence, Insured alleges he "suffered financial losses due to the loss of the building and the loss of other monies [he] paid to repair [the Building] before [it] was razed by [City]."

¶ 11 For bad faith, Insured alleges Cadenhead Title's failure to properly investigate and disclose encumbrances is imputed to Title Insurer "that issued the Owner's policy... to [Insured] through the acts of its agent, Cadenhead Title, and that had the express and implied authority to act."

¶ 12 Instead of filing an answer, Title Insurer moved to dismiss Insured's petition for failure to state a claim upon which relief can be granted pursuant to 12 O.S. 2011 2012(B)(6), attaching portions of the Title Policy on which Insured relied throughout his petition but did not attach. Insured opposed the dismissal motion, attaching his own affidavit and several exhibits referenced in that affidavit. On September 27, 2013, the trial court filed a Journal Entry granting Insured's Motion to Dismiss and dismissing the case with prejudice.

¶ 13 Insured appealed the dismissal. In an unpublished opinion (Case No. 112,286), Division IV of the Oklahoma Court of Civil Appeals reversed the trial court's dismissal order, concluding it lacked reasons for the decision and the required 12 O.S. 2011 2012(G) finding that no defect can be remedied, and remanded the case for further proceedings (*Choate I*). The mandate issued April 10, 2014, directed the District Court "to enter of record the above judgment and to issue process or take further action as required by the order or opinion issued in this appeal."

¶ 14 Following remand, Insured filed a "Motion for Summary Judgment and in the Alternative Motion for Pretrial Conference," and 3 days later, Title Insurer filed a "Motion to Clarify Journal Entry Granting Motion to Dismiss." The record shows at the hearing on the post-remand motions, objections and replies that Insured advised the trial court he had additional evidence to demonstrate dismissal was inappropriate and warranted discovery. According to the minute filed after that hearing on May 21, 2014, the trial court ordered both parties to submit proposed journal entries within twenty days and granted Insured leave to submit an offer of proof of his additional evidence. Between the end of May and early October of 2014, Insured submitted an offer of proof, made discovery requests to Title Insurer, and thereafter filed a motion for leave of court to amend his petition, to all of which Title Insurer filed written responses and/or objections.

¶ 15 The trial court filed a "Clarified Journal Entry" on October 7, 2014, which judgment refers to Insured's appeal of its earlier journal entry sustaining Title Insurer's dismissal motion and to *Choate I*, specifically the remand of the case "with instructions that the Journal Entry state the reasons underlying the Court's decision." "In accordance therewith," the trial court noted it "reviewed the pleadings and briefs, including [Title Insurer's] Motion to Clarify, heard the arguments of counsel for the parties and being fully advised in the premises" and found as pertinent to the issues raised by Insured: 1) the Title Policy "does not cover the claims alleged" in Insured's petition; 2) Insured can allege no set of facts that would bring his claim resulting from the loss of the church building within the coverage afforded by the Title Policy; 3) Insured has failed to allege any duty or contractual obligation breached by Insurer; 4) Based on Insured's allegation the damages were caused by an arsonist, his alleged damages were not proximately caused by any act or omission of Title

Insurer; 5) Insured's claims are barred by the expiration of the applicable statute of limitations; 6) Insured has failed to allege any actions of Attorney that could fall within the scope of the issuance of a title insurance policy; 7) the allegations show Insured cannot state any set of facts that would entitle him to recover against Insurer; 8) granting leave to amend would serve no purpose as the factual defects set forth above are incurable; and 9) Insured's motion for summary judgment fails to comply with District Court Rule 13 since it was not filed with any evidentiary material.

¶ 16 Two days after the filing of the Clarified Journal Entry, Insured filed a Motion to Reconsider and For Recusal, the latter requesting the judge recuse himself from the case. The trial court denied both motions in a single order filed October 21, 2014. Insured then filed the second appeal in this case.

## STANDARD OF REVIEW

¶ 17 Because Insured's motion to reconsider was filed within ten days of the filing of the Clarified Journal Entry, the order disposing of the motion to reconsider and the underlying judgment are both reviewable. 12 O.S.2011 990.2(A); Okla.Sup.Ct. Rule 1.22(c)(2). The standard of review for a trial court's denial of a motion for a new trial or motion to reconsider is abuse of discretion. *Evers v. FSF Overlake Associates*, 2003 OK 53, ¶ 6, 77 P.3d 581, 584. An abuse of discretion occurs when a decision is based on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling. *Smith v. City of Stillwater*, 2014 OK 42, ¶ 11, 328 P.3d 1192, 1197. In this case, "the propriety of the trial court's denial of the 'motion for reconsideration' rests on the underlying correctness of the motion to dismiss," *i.e.*, the Clarified Journal Entry dismissing the case with prejudice. *Id.*

¶ 18 Because Insured did not attach to the Petition the Title Policy upon which he clearly relied and to which he often referred, Title Insurer's attachment of the pertinent portions of the Title Policy to its motion to dismiss and to its post-remand Motion to Clarify is not considered reliance on extraneous materials that would require this Court to treat either dismissal motion as one for summary judgment. *See May v. Mid–Century Insurance Co.*, 2006 OK 100, ¶ 19, 151 P.3d 132. Insured did attach separate affidavits and extraneous materials to his responses to the dismissal motions. However, when no responsive pleading has been filed by the movant, as here, a plaintiff may not unilaterally change a movant's dismissal motion to one for summary judgment and require the movant to meet a different burden than when challenging the petition's sufficiency. *See State ex rel. Wright v. Oklahoma Corporation Commission*, 2007 OK 73, ¶ 51, 170 P.3d 1024. Like the Court in *Choate I* treated the parties' original dismissal motion and response, we reject Insured's post-remand attempt to convert Title Insurer's post-remand Motion to Clarify to one for summary judgment.

¶ 19 "When reviewing a trial court's dismissal of an action an appellate court examines the issues de novo." *Rogers v. Quiktrip Corp.*, 2010 OK 3, ¶ 4, 230 P.3d 853, 856. "Motions to dismiss are generally viewed with disfavor." *Id.*

¶ 20 "The function of a motion to dismiss is to test the law of the claims, not the facts supporting them." *Smith*, 2014 OK 42, ¶ 12, 328 P.3d at 1197. "No dismissal for failure to state a claim upon which relief may be granted should be allowed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle them to relief." *Id.* "Plaintiffs need neither identify a specific theory of recovery nor set out the correct remedy or relief to which they may be entitled." *Id.*, ¶ 13. "Dismissal is appropriate only for lack of any cognizable legal theory to support the claim or for insufficient facts under a cognizable theory." *Id.*

¶ 21 When an order of a judge in a civil proceeding denies a disqualification application, that order will not be reversed on appeal unless a clear abuse of discretion is shown. *Pierce v. Pierce*, 2001 OK 97, ¶ 21, 39 P.3d 791, 800.

## ISSUES RAISED ON APPEAL

¶ 22 Insured alleges error with the trial court's interpretation of *Choate I* and denial of Insured's post-remand motion for summary judgment. He challenges the court's 1) separate reasons for dismissing his petition, 2) finding his contract claim is barred by the statute of limitations [1], and 3) denying amendment of his petition based on incurable defects. Insured's last error addresses the denial of his motion for the trial judge's recusal.

### *Denial of Insured's Summary Judgment*

¶ 23 Insured's motion for summary judgment was the first of the two post-remand motions filed and then resolved by the Clarified Journal Entry. The trial court denied Insured's summary judgment motion, finding "it fails to comply with District Court Rule 13 since it was not filed with any evidentiary material." Title Insurer made that express objection to Insured's two-page motion and further pointed out it "contains no statement of material facts" and "is wholly ... deficient, fails to comply with applicable rules, and does not state any coherent arguments on which summary judgment could stand."

¶ 24 Insured now alleges error with the "overruling of [his] Motion for Summary Judgment, after the allegations of [his] Petition had been admitted pursuant to District Court Rule 13A, [and] did incorporate by reference the Petition admissions of the Motion to Dismiss." Based on our review of the accelerated record, Title Insurer's motion to dismiss at best admits facts alleged in the Insured's petition which are immaterial in proving the elements of the various theories of recovery he pleaded therein (and to any theory which might be consistent with the alleged facts). Further, the record does not support Insured's claim that his summary judgment motion incorporates by reference the so-called "petition admissions" in Title Insurer's motion to dismiss. Even if he had, Title Insurer correctly argued in its objection to Insured's summary judgment motion that compliance with Rule 13(a) requires "evidentiary material filed with the motion or subse-

quently filed with leave of court," and "a concise written statement of the material facts as to which the movant contends no genuine issue exists, and a statement of argument and authority demonstrating that summary judgment should be granted." Rule 13(a) further provides "Unless otherwise ordered by the court, a copy of the material relied on *shall be attached* to or filed with the statement." Such language does not permit incorporation by reference of previously filed evidentiary material, and we find no error with the court's ruling.

### *Interpretation of Choate I*

¶ 25 Insured alleges the trial court's Clarified Journal Entry disregards the *Choate I* order for "further proceedings" and misinterprets the same as simply instructing the court to state its reasons for the underlying dismissal order. "When a cause is reversed and remanded by the Supreme Court and the mandate is received and entered of record by the trial court, the trial court is vested with jurisdiction to make any order or enter any judgment in the further progress of the cause not inconsistent with the decision of the Supreme Court, and in making such orders, the trial court has jurisdiction to interpret the decision and mandate of the Supreme Court." *Berland's Inc. of Tulsa v. Northside Village Shopping Center, Inc.*, 1968 OK 136, ¶ 0, 447 P.2d 768; *Brumark Corporation v. Corporation Commission of the State of Oklahoma*, 1996 OK CIV APP 89, ¶ 8, 924 P.2d 296, 301. "This Court may similarly construe the mandate issued in connection with its opinion," and in doing so, "this Court must carefully consider the opinion on which it is based." *Brumark* (citing *Harris v. Chambers*, 1926 OK 566, 121 Okla. 75, 247 P. 695). "The true intent thereof must be deduced from a consideration of the entire opinion." *Id.*

¶ 26 We have considered the mandate and *Choate I* in its entirety. In light of the Court's clear and unambiguous reasons for reversing the first order dismissing Insured's case with prejudice, we find no error with the trial court's interpretation that pro-

---

1. In light of the findings in this Opinion, we need not address this issue.

viding precise reasons for granting Title Insurer's motion to dismiss for failure to state a claim upon which relief may be granted *and* making the required 2012(G) determination when dismissing the case with prejudice, and is consistent with the *Choate I* Court's remand of the case "for further proceeding."

### Breach of Contract

■ ¶ 27 To recover under a claim for breach of contract in Oklahoma, a plaintiff must show: 1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach. *OPY I, L.L.C. v. First American Title Ins. Co., Inc.*, 2015 OK CIV APP 49, ¶ 7 n.3, 350 P.3d 163, 169 (citing *Digital Design Group, Inc. v. Information Builders, Inc.*, 2001 OK 21, ¶ 33, 24 P.3d 834). Title Insurer contends Insured can allege no set of facts to prove the last two elements.

¶ 28 The contract in this case, like in *OPY I, L.L.C.*, is a policy for "title insurance," defined by Oklahoma law in effect since 1957, as "*insurance* of owners of property or others having an interest therein, or liens or encumbrances thereon, *against loss by encumbrance, or defective titles, or invalidity, or adverse claim to title*." (Emphasis added.) 36 O.S.2011 709. A "*title insurance policy* is any written instrument *purporting to show the title* to real or personal property or any interest therein or encumbrance thereon *or to furnish such information relative to real property*, which written instrument in express terms *purports to insure or guarantee such title or the correctness of such information*." 36 O.S.2001 5004.

■ ¶ 29 Title insurance "is ordinarily considered a contract of indemnity"[2] whose "*unique nature* makes it somewhat different from other breach of contract disputes."[3] (Emphasis added.) *OPY I, L.L.C.*, 2015 OK CIV APP 49, ¶ 7, 350 P.3d 163. Relevant to this appeal, title insurance is "of a state of ownership at a specific point in time," which "in practical terms" means "[t]he risk is actually retrospective," since "the defects must exist at the time of the purchase of insurance in order to be covered; only the discovery of the defect is prospective." 11 Couch on Insurance 3d, 159:5. "The duration [of the title policy] is indefinite; as long as the defect existed when the insurance was purchased, the insurance coverage exists until the insured divests or alters title in a way that terminates coverage under the terms of the agreement." *Id.*

■ ¶ 30 Identical to the title policy's coverage provision in *OPY II, L.L.C.*, the Title Policy in this case "*insures*, as of the Date of the Policy ... *against any loss or damage* ... sustained or incurred by the insured *by reason of* ... 2. Any defect in or lien or encumbrance *on the title*; 3. Unmarketability *of the title*." In the breach of contract section of Insured's petition, he alleges City's so-called "policy decision" to demolish and/or condemn the Building *created* the "defect in or lien or encumbrance on the title" and "unmarketability of the title," respectively section (2) and section (3).

¶ 31 Title Insurer's dismissal motions argue Insured's allegations about the condemnation, burning or demolition of the Building or its agent's failure to disclose City's alleged secret plan to accomplish the same do not fit with the Title Policy's clear and unambiguous terms. It also argues Insured has not alleged his title to the property is "not good" or that any other person or entity has claimed ownership of the property. In short, Title Insurer

---

2. In Oklahoma, "[i]ndemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." 15 O.S. 2001 421. The two different types of indemnity contracts either indemnify against liability or against loss, *i.e.*, "claims or demands, damages or costs." 15 O.S. 2001 427(1) and (2). Neither party specifically identifies the title policy in this case as an indemnity contract, which like the title policy in *OPY I, LLC* "insures ... against any loss or damage ... sustained or incurred by the insured."

3. *See also* 42 Real Property Probate & Trust Journal 1, 4 (pointing out the biggest distinction between title insurance and most other forms of insurance has been that "[t]he risks of title insurance end where the risks of other kinds [of insurance] begin. In other words, title insurance primarily has covered risks that exist and are discoverable on the date the policy is issued, while most insurance covers the insured for matters that first arise after the policy's effective date.")

contends Insured has not and cannot allege any facts that would indicate he does not have clear and marketable title to the property.

¶ 32 Insured does not challenge Title Insurer's dismissal arguments in either of his responses. In the post-remand response, however, Insured admits his claim against Title Insurer "was for its *failure to insure* the Warranty Deed of his predecessor in interest that stipulated there were *no encumbrances* of any kind and that the grantor would forever defend the title." Whether Insured's factual allegations and all reasonable inferences sufficiently state a claim for breach of contract requires application of the following rules of construction to the Title Policy.

¶ 33 An insurance policy is a contract which this court will interpret and determine whether it is ambiguous. *Haworth v. Jantzen*, 2006 OK 35, ¶ 13, 172 P.3d 193, 196. If the contract terms "are unambiguous, clear, and consistent," they "will be accepted in their plain and ordinary sense, and the contract will be enforced to carry out the intentions of the parties as it existed at the time the contract was negotiated." *Dodson v. St. Paul Ins. Co.*, 1991 OK 24, ¶ 12, 812 P.2d 372, 376. The general declaration of insurance coverage, as established by the insurance policy and limited by its provisions, normally determines the insurance carrier's liability, and the insured's respective rights under the contract by identifying what risks are covered and excluded by the policy. *Id.*, ¶ 12.

¶ 34 The subject Title Policy's coverage provision declares it "insures, as of the date of the policy, against loss or damage sustained or incurred by the insured by reason of ... 2. any defect in or lien or encumbrance on the title," [or] 3. unmarketability of the title." Agreeing with Title Insurer this coverage provision is not ambiguous, we look to the plain and ordinary meaning of its language to determine whether Insured's loss is covered. *Porter v. Oklahoma Farm Bureau Mutual Insurance Co.*, 2014 OK 50, ¶ 19, 330 P.3d 511, 517.[4]

¶ 35 Based on the policy term in common to sections (2) and (3), "title," and Oklahoma law, we conclude no further interpretation of the remaining terms in the coverage provision is necessary. In quiet title actions in Oklahoma, "title" is defined as "the judicial or nonjudicial conclusion regarding either legal or equitable *ownership of real property* or an *estate in real property* located in the State of Oklahoma." (Emphasis added.) 12 O.S. 1141.2(22). In Oklahoma, real property consists of the *land* and, as pertinent here, that which is affixed to the land." 60 O.S. 2001 5. "A thing is deemed affixed to land when it is ... embedded in it, as in the case of walls, or permanently resting upon it, as in the case of buildings." *Id.*

¶ 36 Insured has not alleged the *title* or *ownership* to his *real property* or land has been affected by the loss of the Building, the cause of which he admits in the petition was determined to be arson. He also has not alleged any person or entity has made either a claim of ownership or to an interest to his

4. Neither party argues, relies on, or cites to policy definitions of any term used in the Title Policy's coverage provision in their respective dismissal motions and responses. However, according to our research, the title insurance industry standard forms that were available in 2005 (when the Title Policy was issued) have never included a definition of its coverage provision terms, "defect," "lien" or "encumbrance." 1 Title Ins. Law 5:5 (2015 ed.) The same reveals the phrase "unmarketability of the title" was first defined in the 1987 standard form as

an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A ... to be released from the obligation to pur-

chase by virtue of a contractual condition requiring the delivery of marketable title. (Italics added.)

Although ALTA amended the latter definition in 2006, the addition of both terms "did not significantly alter the coverage for unmarketability of title that the title policy traditionally has provided." *Id.* "Each jurisdiction's judicial definition still will control since [it] will determine whether the existence of a particular title defect would entitle a purchaser from the insured to be released from the contract to purchase, as required by the policy." *Id. See also Radovanov v. Land Title Co. of America*, 189 Ill.App.3d 433, 136 Ill.Dec. 827, 545 N.E.2d 351, 354 (1994) and *Bethurem v. Hammett*, 736 P.2d 1128, 1132 (Wy. 1987) (both courts holding issue whether title to real estate is marketable is a question of law).

land. Instead, the loss Insured alleges he sustained is to *the Building* affixed to his land.

¶ 37 A title insurance policy insures against defects or clouds in *title* to land, not land itself. 11 Couch on Ins. 3d, 159:5. Many courts distinguish between matters that affect the title to land and matters that affect only the physical condition of the land. 1 Title Ins. Law 5:5 (2015 ed.), "Defects, liens or encumbrances."

¶ 38 Similarly, several courts distinguish between loss caused by unmarketability of the title and by physical conditions or other matters affecting the market value of the property. 1 Title Ins. Law 5:7 (2015 ed.), "Unmarketable title." "Defects which merely diminish the value of the property, as opposed to defects which adversely affect a clear title to the property, will not render title unmarketable within the meaning and coverage of a policy insuring against unmarketable title." 11 Couch on Insurance 3d 159:7.

¶ 39 Even if taken as true, Insured's allegations of City's decisions prior to Insured's purchase of the Property, *i.e.*, not to issue an "occupancy certificate" and to remove his and other downtown buildings "as dilapidated and blighted structures in need of condemnation," relate solely to the physical condition of the land, *i.e.*, the Building, specifically its safety or lack thereof because of the physical condition. Although the loss of the Building may affect the value of the land, we conclude it does not affect *title* to the same.

¶ 40 Our research yields no cases precisely on point, but one case involving similar facts and a similar title policy coverage provision supports our conclusion. In an action by a property owner/insured against its title insurer, *Elysian Investment Group, LLC v. Stewart Title Guaranty Company*, 105 Cal. App.4th 315, 320, 129 Cal.Rptr.2d 372 (2002), the Court found a *recorded* municipal notice that informed the owner a building on the land was substandard did not affect the title to his property, but instead warned of "physical defects at the property" and "his duty created by ordinance to comply with local building and zoning requirements." The Court in *Elysian* also determined the same

recorded Notice did not affect the marketability of the insured's title, because it provided "notice of the physical condition of the property" that was not covered by the Policy and "did not raise any doubts about title." *Id.*, at 324, 129 Cal.Rptr.2d 372.

■ ¶ 41 Support for our conclusion is also found in Oklahoma's statutes that regulate title insurers and the issuance of title policies. "Under Oklahoma law, insurance policies are issued pursuant to statutes, and the provisions of those statutes are given force and effect as if written into the policy." *Shepard v. Farmers Ins. Co., Inc.*, 1983 OK 103, ¶ 2, 678 P.2d 250, 251. Pursuant to Oklahoma law in effect when the Title Policy was issued to Insured, 36 O.S.2001 5001(C) required "every policy of title insurance ... issued by any company authorized to do business in this state shall be countersigned by some person ... actively engaged in the abstract of title business as defined... in Title 1 or *by an attorney licensed to practice in the State of Oklahoma duly appointed as agent of a title insurance company*." (Emphasis added.) Section C further mandated "that no policy of title insurance shall be issued in the State of Oklahoma except after examination of a *duly certified abstract of title* prepared by a bonded and licensed abstracter as defined herein." (Emphasis added.) Since 1984, "abstract of title" has been defined by Oklahoma statutes as "a compilation in orderly arrangement of the *materials and facts of record, in the office of the county clerk and court clerk, affecting the title to a specific tract of land* issued pursuant to a certificate certifying to the matters therein contained." (Emphasis added.) 74 O.S. 2001 227.11(1) [renumbered in 2007 as 1 O.S. 21(1) ].

¶ 42 In *OPY I, L.L.C.*, the *lis pendens* notices of pending litigation between the seller and a third party over the same property described in the title insurance policy were filed *of record* in the required county office, as were the expungement of those notices. Unlike those notices, Insured has not alleged "any materials or facts" were filed "of record in the office of the county clerk and court clerk" which would affect or cloud *the title* to his real property. His allegation that the

memorandum of "the Church's intent to raze their church building ... was memorialized in the [City's] files" clearly fails to comply with Oklahoma's statutory filing requirement in the two specific county offices, and as a matter of law, the memorandum would not be included in a certified abstract of title examined by an attorney for purposes of issuing a title insurance policy.

¶ 43 On this subject, most telling is the absence of any allegations that the statutorily mandated examination of the abstract of title to Insured's Property was negligently performed and/or that the examining attorney failed to disclose any materials or facts filed "of record in the office of the county clerk and court clerk" which would affect or cloud *the title* to his real property. As an agent, Cadenhead Title's duty to its principal, Title Insurer, was to perform the statutorily required examination of a certified abstract of title and to discover and disclose any documents therein to Title Insurer for purposes of its risks assessment and approval of coverage, making of exceptions, etc.

¶ 44 Further, as Insured alleges, the Church changed its intent to raze the Building. Other than the allegations of the "policy decision" to condemn the "dilapidated and blighted" Building made by several City employees and the "pending adverse consequences from [such] policy," Insured has not alleged City's governing body officially approved or acted on that decision *prior to issuance of the Title Policy* by taking the necessary statutory steps to: a) commence condemnation of the Building pursuant to 11 O.S.Supp.2004 22–112(A)(1)–(3), which mandates notice to owner and the filing by the municipal clerk "a notice of dilapidation and lien with the county clerk" etc.; or b) approve a resolution for an urban renewal plan for a blighted area pursuant to 11 O.S. 2001 38–106. Taking as true Insured's allegations about City's "policy decision" to condemn the Building, as he alleges it stood when the Title Policy was issued, said decision was a mere plan or possibility, which status clearly does not qualify for coverage under section (2) or (3) of the Title Policy. *See Strass v. District–Realty Title Insurance Corp.*, 31 Md.App. 690, 358 A.2d 251 (1976)(when title policies

were issued, city had option to levy city assessments for improvements; such potential assessments were neither liens nor encumbrances until they were inevitable, *i.e.*, approved by the city council); *Princeton South Investors, LLC v. First American Title Insurance Company*, 437 N.J.Super. 283, 97 A.3d 1190 (2014) (municipality's pending tax appeals on property purchased at foreclosure sale were insufficient to create an encumbrance or other covered title defect under title policy); *Rhone v. First American Title Insurance Company*, 401 Ill.App.3d 802, 340 Ill.Dec. 588, 928 N.E.2d 1185 (2010) (potential un-assessed property taxes did not constitute an encumbrance or lien on townhouse when title insurance policy was issued to purchasers).

¶ 45 In light of the above considerations, we find none of the alleged conduct alleged in Insured's petition is covered by the Title Policy and the trial court did not err by dismissing Insured's theory of recovery based on breach of contract.

### Bad Faith

¶ 46 "An insurer has an implied in law duty to act in good faith and deal fairly with its insured to ensure that the policy benefits are received ... the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive damages may be sought." *Christian v. Am. Home Assurance Co.*, 1977 OK 141, ¶ 25, 577 P.2d 899, 904. The Oklahoma Supreme Court has not expressly held this duty is owed by title insurers to its insureds, but has generally recognized an insurer's duty "extends to all types of insurance companies and insurance policies." Assuming for purposes of this appeal that such duty exists, Oklahoma courts hold an insurer's withholding of payment is not unreasonable or in bad faith when there is a legitimate dispute concerning coverage and when there is no conclusive precedential legal authority on that issue. *See Skinner v. John Deere Insurance Co.*, 2000 OK 18, 998 P.2d 1219. Having affirmed the trial court's dismissal of Insured's breach of contract claim because the Title Policy does not cover his claim for the loss to his Building, we find the existence of a

legitimate coverage dispute in this case supports the trial court's dismissal of Insured's theory of recovery based on bad faith.

## Negligence

**** ¶ 47 It is settled law in Oklahoma that "to hold master or principal responsible for tort or negligence of his servant or agent, plaintiff must establish that act committed by servant or agent was within the scope of his authority as such servant or agent, and in the course of his employment." *Allison v. Gilmore, Gardner & Kirk, Inc.*, 1960 OK 48, ¶ 28, 350 P.2d 287, 292. In this case, Insured alleges Cadenhead Title is an agent of Title Insurer, which party did not file an answer or expressly admit such allegation in its dismissal motions. However, not only must this Court take Insured's agency allegation as true, 36 O.S.2005 5001(C),[5] as previously explained, mandated that agency relationship when the Title Policy was issued to Insured in 2005.

**** ¶ 48 "The existence of a duty of care is the threshold question in any negligence action." *Lowery v. Echostar Satellite Corp.*, 2007 OK 38, ¶ 12, 160 P.3d 959. *See also Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 25, 121 P.3d 1080 (prima facie case for breach of the duty of good faith and fair dealing requires plaintiff establish the defendant owed them a duty). Insured's Petition here relies on the common law duty to use ordinary care and skill to avoid harm when circumstances place the defendant in such a position with the plaintiff that the defendant's failure to use ordinary care and skill in his conduct would cause the plaintiff danger.

¶ 49 Interpreting the 1981 version of 5001(C) in *American Title Insurance Company v. M–H Enterprises*, 1991 OK CIV APP 58, ¶ 12, 815 P.2d 1219, 1221, the Court found the title insurer's "failure to obtain a duly certified abstract of title and have it examined by a duly licensed attorney constitutes negligence per se." *See also* Okla. A.G. Opin. No. 78–151 (reached same conclusion interpreting identical 1971 version of 5001).[6]

¶ 50 Although *American Ins. Co.* has no precedential value, we conclude the Legislature's amendment in 2015 to 5001(C), which now prohibits issuance of a title insurance policy in Oklahoma "except: (1) After examination by an attorney licensed to practice in this state,"[7] reveals legislative intent "to clarify that which previously appeared doubtful."[8] *See American Airlines v. Hickman*, 2007 OK 59, ¶ 11, 164 P.3d 146, 149. In this case, however, Insured has neither alleged he

---

**5.** Section 5001(C) then provided, "[e]very policy of title insurance issued by any company authorized to do business in [Oklahoma] shall be countersigned by "some person, partnership, corporation or agency actively engaged in the abstract of title business as defined and provided in Title 1 or by an attorney licensed to practice in [Oklahoma] duly appointed as agent of a title insurance company, provided that no policy shall be issued in [Oklahoma] except after examination of a duly certified abstract of title prepared by a bonded and licensed abstracter as defined herein."

**6.** In reaching this opinion, the then-Attorney General of Oklahoma, Larry Derryberry, considered 1) this state's "Insurance Commission has given its long-standing approval to the practice of the industry of issuing title insurance only after an attorney examines the abstract and issues his title opinion," 2) "many jurisdictions have ruled directly that the examination of an abstract and certification as to the validity of title constitutes the practice of law" and 3) the definition of "title insurance policy" provided by 36 O.S.1971 5004 (still current). Concluding "since by definition a 'title insurance policy' expresses an opinion as to the marketability of title which

is relied upon by another, it only follows that a title insurance company would be illegally practicing law if its title insurance policy is issued without an examination of the abstract by a duly licensed attorney.

**7.** *See* 36 O.S.Supp.2015 5001(C), which in relevant part states "provided, that no policy of title insurance shall be issued in the State of Oklahoma except: (1) *After examination by an attorney licensed to practice in this state* of a duly certified abstract extension or supplemental abstract ... from the effective date of a prior owner's policy of title insurance issued by a title insurer licensed in this state provided by the insured pursuant to the policy at the time a valid order is placed ...." (Emphasis added.)

**8.** Similarly, 36 O.S.Supp. 2015 5001(C)(2), provides "[i]f the previously insured owner does not provide a copy of the owner's policy of title insurance, then a title insurance policy may be issued after examination by an attorney licensed to practice in this state of a duly certified abstract of title prepared by a bonded and licensed abstractor as defined in the Oklahoma Abstractors Law."

took a duly certified abstract of title to Cadenhead Title or that Title Insurer through its agent, Cadenhead Title or its owner, Attorney, did not obtain the required title abstract, or that a duly licensed attorney did not examine the abstract prior to issuance of the Title Policy in 2005.

¶ 51 Assuming [9] under the version of 5001(C) in effect when the Title Policy was issued that Title Insurer owed a duty of ordinary care to Insured and, as Insured alleges, Title Insurer limited its liability by the Title Policy's terms to "errors and omissions or torts committed by its agents," Insured has not made one allegation in his petition that either Title Insurer, Cadenhead Title, or Attorney violated any 5001(C) duty in any way. More specifically, he has not alleged Cadenhead Title or Attorney negligently performed an examination of a certified abstract of title and/or failed to discover material filed of record in the appropriate offices that affected the title to his real property and was included in the certified abstract of title that was examined.

¶ 52 Insured also alleges Title Insurer owed him a duty to monitor and investigate its agents such as Cadenhead Title and to require the same to disclose any potential conflicts of interest that might adversely affect the marketability of the title insured by Title Insurer.

¶ 53 We conclude, under the facts and allegations in this case, Title Insurer neither owed a duty to investigate or monitor its agents for any and all potential conflicts of interest nor to require its agents to disclose a conflict of interest which by way of speculation "*might* adversely affect the marketability of the title."

### *Negligent Retention*

¶ 54 Under Rule 1.36, where briefs are absent, the petition in error plays a critical role in determining what issues the appellant has preserved for consideration on appeal. *Siemens Financial Services, Inc. v. MTG Guarnieri Manufacturing, Inc.*, 2012 OK CIV APP 1, ¶ 8, 269 P.3d 36, 39. Insured's Petition in Error does not list the trial court's dismissal of this specific theory as one of several "issues to be raised on appeal," nor is the issue clarified or fairly comprised in any section of the Petition in Error from which this Court could conclude the issue has been preserved for review on appeal. Insured's failure to raise an error for appeal by inclusion in the petition in error is fatal to its consideration. *See Marshall v. Fenton, Fenton, Smith, Reneau and Moon, P.C.*, 1995 OK 66, n. 3, 899 P.2d 621, 624; *Markwell v. Whinery's Real Estate, Inc.*, 1994 OK 24, ¶ 8, 869 P.2d 840, 843.

### *Denial of Insured's Motion for Recusal*

¶ 55 Rule 15, Rules for the District Courts of Oklahoma, requires "before filing any motion to disqualify a judge an in camera request shall first be made to the judge to disqualify or to transfer the cause to another judge." The trial judge denied Insured's written motion to recuse from the case, finding "[he] did not follow the procedure set out in Rule 15 by first making an in camera request." The trial judge also found he "knows of no reason for his recusal or disqualification, nor does he know of any reason to transfer this case to another judge." Alleged errors with a trial judge's ruling on a motion seeking the judge's recusal and/or disqualification will not be reviewed when the appellant did not follow the proper procedure for seeking disqualification of a trial court judge. *See Harmon v. Damet*, 2012 OK CIV APP 25, ¶ 23, 274 P.3d 810, 813 (citing *Carrigan–St. Clair v. Wildwood Preserve Farms, Inc.*, 2009 OK 89, ¶ 3, 228 P.3d 1198, 1199).

### CONCLUSION

¶ 56 The trial court's order dismissing Insured's petition with prejudice is AFFIRMED.

MITCHELL, P.J., and JOPLIN, J., concur.

---

9. *See Silver v. Slusher*, 1988 OK 53, ¶ 10, 770 P.2d 878, 883 (explaining "[t]he common law supplements [Oklahoma] statutes. It remains in full force unless it is clearly and expressly modified or abrogated by [Oklahoma] constitution or by statute.")